IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CR-5-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SANJAY KUMAR, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motions to dismiss (DE 116, DE 118) and the government's motion for interlocutory sale (DE 130). The issues raised have been briefed fully and are ripe for ruling. For the reasons that follow, defendant's motions and the government's motion are denied.

## STATEMENT OF THE CASE

On February 22, 2018, defendant was named in a forty-five count second superseding indictment charging defendant with the following:

- conspiracy to unlawfully proscribe, dispense, and distribute oxycodone, oxymorphone, hydromorphone, and alprazolam in violation of 21 U.S.C. § 846 (count one);
- possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (count two);
- unlawful prescription, dispensation, and distribution of oxycodone in violation of 21 U.S.C. § 841(a)(1) (counts three through twenty-three);
- possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c)(1)(A)(i) (count twenty-four);
- unlawful prescription, dispensation, and distribution of alprazolam in violation of 21 U.S.C. § 841(a)(1) (counts twenty-five through thirty);
- engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 (counts thirty-one through thirty-two);
- laundering of monetary instruments in violation of 18 § U.S.C.

> 1956(a)(1)(B)(i), (ii) (counts thirty-three through forty-two); and
>
> • attempt to evade and defeat tax in violation of 26 U.S.C. §7201 (counts forty-three through forty-five).

(DE 86).

On April 8, 2018, defendant filed the instant motion to dismiss "for violation of the speedy trial act," arguing that his indictment should be dismissed in full due to 1) pre-indictment delay and 2) post-arrest delay. (DE 116 at 1). On April 9, 2018, defendant filed the instant motion to dismiss "for failure to state a crime, lack of subject matter jurisdiction, due process, and outrageous government conduct," arguing that his indictment should be dismissed in part[1] for 3) failure of the government to properly bring a claim against defendant for violations of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and 4) outrageous government conduct. (DE 118 at 1).

Additionally pending and referred to United States Magistrate Judge Robert T. Numbers are the following motions filed by defendant: motion for evidence under Rule 404(b) (DE 97), motion for release of Brady materials (DE 98), motion for disclosure of confidential informants (DE 99), motion for disclosure of officer's rough notes and recordings (DE 100), motion for disclosure of exculpatory evidence (DE 101), motion for disclosure of surveillance (DE 102), motion for discovery (DE 103), motion to compel discovery unproduced (preservation) (DE 104), motion for bill of particulars (DE 113), motion for return of property/pretrial (DE 114), and motion to suppress (DE 120).

The government filed omnibus response to all pending motions on May 25, 2018. (DE 126). On May 29, 2018, the court granted parties' consent motion to hold in abeyance motions in limine filed by defendant (DE 115, DE 121), providing for a deadline for filing of all motions in limine by

---

[1] Defendant argues counts one through forty-two should be dismissed and that "[d]efendant does not herein address counts 43-45, except to the extent that the Government's evidence is tainted." (DE 118 at 1n.1).

September 3, 2018. (DE 127). On June 6, 2018, the government filed the instant motion for interlocutory sale, seeking authorization from the court to conduct an interlocutory sale of defendant's vehicles seized in accordance with Fed. R. Crim. P. 32.2(b)(7) and Supplemental Rule G(7)(b), to which defendant filed opposition on June 12, 2018.

Arraignment is scheduled to occur during the court's August 14, 2018 term, and trial is scheduled to begin October 1, 2018.

**STATEMENT OF THE FACTS**

The facts as pertinent to the resolution of defendant's instant motions to dismiss, as forecast by the government, may be summarized as follows. For more than ten years, defendant operated a purported pain management clinic in New Bern, North Carolina called "New Bern Medicine and Sports Rehabilitation." (DE 126 at 5). From approximately 2011 to 2016, defendant prescribed more than one million pills containing Schedule II and Schedule IV controlled substances, and allegedly received more than $1,000,000.00 in cash for those pills. (Id.).[2]

A.     Initiation of Investigation

Around 2012 or 2013, New Bern Police Department ("NBPD") investigators learned from pill users and pill dealers that defendant was someone whom pill seekers could "go to, pay a cash fee, [and] get prescription[s] without [a] proper medical check." (Id. at 8 (citing transcript of detention hearing (DE 27) at 7)). NBPD investigators also began receiving complaints from pharmacies in the New Bern area; they were concerned about the legitimacy of defendant's practice because of the extremely high volume of Schedule II controlled substances that defendant was

---

[2]  "Oxycodone is a potent and addictive opioid that is classified as a Schedule II drug under the Controlled Substances Act." United States v. McIver, 470 F.3d 550, 553 n. 3 (4th Cir.2006) (citing 21 U.S.C. § 812 (2000); 21 C.F.R. § 1308.12(b)(1) (2004)). Oxymorphone and hydromorphone are also classified as a Schedule II drug. See 21 C.F.R. §§ 1308.12(b)(1) (2017). Alprazolam is classified as a Schedule IV drug. See id. § 1308.14(c)(2).

prescribing. (Id.).

In 2013, one of defendant's patients, Amber Sandvig Garris, crossed the center line while driving and crashed. (Id.). Garris's six-year-old daughter, Alanna, died in the wreck, and at the time of the crash, Garris had oxycodone in her system. (Id.).

Based on the information learned from street-level drug investigations and complaints from local pharmacies, as well as the wreck in which Garris' daughter died, investigators decided to open a multi-agency investigation into defendant's practice. (Id. at 9). The investigation involved the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS"), the State Bureau of Investigation ("SBI"), the Craven County Sheriff's Office, and NBPD. (Id.). The investigation was complex, including: interviews of multiple pharmacists; interviews of dozens of defendant's patients; interviews of pill users and pill distributors; interviews of various associates of defendant; the installation of a pole camera outside of defendant's office; subpoenas for records; trash pulls; attempted undercover operations; multiple federal search warrants and federal seizure warrants; analyses of financial records; and analyses of prescription records. (Id.).

B.    Interviews of Patients

Agents interviewed dozens of patients regarding defendant's purported pain management practice. (Id.). At least two well-known drug dealers in the New Bern area stated that an "intermediary" had suggested that they go to defendant. (Id. (citing transcript of detention hearing (DE 27) at 12)). They "were never checked out physically"; in other words, they never received a medical examination from defendant. (Id. (citing transcript of detention hearing (DE 27) at 12)). They met with defendant, paid him $200 in cash, and received a prescription for oxycodone, which one of those patients then filled and sold on the street. (Id. at 10).

4

Other drug-selling "patients" stated that they would go in, make a complaint of some pain, and pay $200 in cash. (Id.). Defendant would give little or no medical examination. (Id.). At first, the patient would receive a prescription for 10-milligram oxycodone pills, and the prescription might later be increased to 15- or 20-milligram pills. (Id.).

After a few months of "treatment" by defendant, several individuals seeking actual medical care felt that they were becoming addicted to the pills that defendant was prescribing. (Id.). Some raised concerns with defendant about their feelings of addiction, and some even asked for referrals to other doctors. (Id.). Defendant refused to give referrals to other doctors. (Id.). Individuals sometimes asked for non-narcotic pain treatment options. (Id.). Defendant, however, would provide only narcotic pills and wholly unsupervised "physical therapy." (Id.).[3]

One "patient"stated that during one "exam," defendant asked to see her arms. (Id. at 13). The person stated that at the time, she had very visible "track marks" on her arms as a result of injecting drugs into her veins. (Id.). Defendant looked at the track marks and would have seen them, but defendant did not ask about them nor did he discontinue prescriptions of Schedule II controlled substances to that patient. (Id. at 13-14).

Another person came in with the goal of obtaining Schedule II pills and made a complaint of back pain, which was not true. (Id. at 14). Defendant asked the patient to obtain an X-Ray of his back. (Id.). The person did obtain the X-Ray; defendant looked at it briefly and said that there was "nothing wrong" with that patient. (Id.). As a result, defendant stated that he could only prescribe

---

[3] The government alleges that in the later years, after the brief "exam," defendant would send a patient to a room that had various exercise equipment including treadmills, a bike, and some weights, but no supervision. (DE 126 at 12). Patients who had been "examined" by defendant would begin to gather in the "gym" until there were six or eight or ten of them in the "gym." (Id.). Defendant would then come to the gym and hand prescriptions out to each person. (Id.). The person's initials would be on the back of the prescription. (Id.).

Schedule II controlled substances to the person for five or six months, and then the person would have to pause briefly; a month or two later, defendant would be able to re-start the flow of pills to the "patient." (Id.). The "patient" admitted to investigators that he either sold or abused the pills. (Id.).

Interviews also established that defendant had a "recruiter" who was working in the community to send patients to him. (Id.). The person would regularly tell other drug users and dealers that defendant was an easy source of supply for pills. (Id.). One "patient" indicated that he gave the recruiter the $200 fee, and the recruiter then gave the "patient" a prescription without the "patient" having to see defendant personally; therefore, no examination was conducted. (Id.).

Investigators also spoke with multiple pharmacists in the New Bern area. (Id.). Some pharmacists indicated that Defendant was prescribing so many pills that he alone was "depleting" their stocks of pills. (Id.). Based on their concerns, several pharmacies in New Bern met and decided that they would no longer fill defendant's prescriptions. (Id.). "Patients" would then drive farther and farther away to get their prescriptions filled; some would drive as far as Raleigh, Beaufort, or Greenville to find a pharmacy that would fill defendant's prescriptions. (Id.). Defendant was aware that local pharmacies were refusing to fill his prescriptions, and he often advised "patients" where they could go to get his prescriptions filled. (Id. at 14-15).

C.    Search Warrants

Based on the investigation, proposed warrants were submitted and approved by United States Magistrate Judges Robert T. Numbers, III, and James E. Gates. (Id. at 21 (citing 4:16-MJ-1072, 4:16-MJ-1073, 4:16-MJ-1076, 4:16-MJ-1121, and 4:16-MJ-1082 (search warrants); 4:16-MJ-1070, 4:16-MJ-1071, 4:16-MJ-1160 (seizure warrants)).

In the summer of 2016, the warrants were executed, and various documents and electronic devices were seized from the defendant's house and office. (Id.). At defendant's house in New Bern, agents also seized approximately 36 firearms and tens of thousands of rounds of ammunition for those weapons. (Id.).

Defendant was arrested on state charges, and he was found in possession of approximately $144,000 in cash. (Id.). Inside the house, agents found even larger amounts of cash. (Id.). The cash was stuffed into large PVC pipes, and the pipes were sealed and taped. (Id.). The PVC pipes of currency were inside duffel bags. (Id.). In total, agents seized more than $400,000 from those PVC pipes. (Id.).

Inside the house, agents also seized four prescription pill bottles, without labels, containing approximately 165 suspected Schedule II pills. (Id. at 22). In a storage unit, which was also searched pursuant to a warrant, agents seized about 64 additional pills of various types, as well as financial documents. (Id.).

Searches were also conducted, pursuant to warrants, of the defendant's storage unit and safe deposit boxes. (Id.). During the investigation, agents have also obtained hours and hours of video footage that defendant filmed during the 2011 to 2016 time period. (Id.). The footage includes defendant's recordings of his confrontations with citizens of New Bern who he believed were working at the direction of the NBPD. (Id.).

## COURT'S DISCUSSION

A.    Standard of Review

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed.R.Crim.P. 12. At any time before trial, a defendant

can raise a motion asserting "a defect in the indictment or information, including . . . failure to state an offense." Fed.R.Crim.P. 12(b)(3)(B).

B.      Analysis

        1.      Defendant's Motions to Dismiss

Defendant asserts four grounds in support of his motions to dismiss, arguing that his indictment should be dismissed in full due to 1) pre-indictment delay and  2) post-arrest delay and that his indictment should be dismissed in part due to 3) failure of the government to properly bring a claim against defendant for violations of the CSA and 4) outrageous government conduct.  The court will address each argument in turn below.

                a.      Pre-Indictment Delay

The Fifth Amendment provides, in relevant part, that no person shall ". . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  In the context of a due process challenge to pre-indictment delay, the Supreme Court has explained that the Fifth Amendment "would require dismissal of the indictment if it were shown at trial that the preindictment delay . . . caused substantial prejudice to [defendant's] right[] to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307 (1971).  The Fourth Circuit has established a two-part inquiry to determine whether pre-indictment delay violates due process.  See United States v. Automated Med. Labs., Inc., 770 F. 2d. 399 (4th Cir. 1985).  "First, a court must assess whether the defendant has suffered actual prejudice, and the burden of proving such prejudice is clearly on the defendant.  If the threshold requirement of actual prejudice is met, the court must then consider the Government's reason for the delay, balancing the prejudice to the defendant with the Government's justification

for the delay." Id. at 403-04.

Defendant argues that in violation of his due process rights, "law enforcement engag[ed] in a systematic targeting of his medical practice for over a three year period [in] which no charges were brought against him," which resulted in "egregious harm to his stability, devastating loss to his professional practice, and complete loss of his personal possessions, reputation, mental stability, personal security, and financial security." (DE 116 at 1; see id. at 1-2 ("Delay occasioned by law enforcement extrajudicial harassment resulted in ultimately driving him to distrust all government mechanisms and processes, and as result of his resistance to same and loss of security, he was ultimately driven to confrontations resulting in his arrest")).

Although defendant alleges general and unsubstantiated harm as a result from pre-indictment delay, these harms are unrelated to defendant's ability to defend himself at trial; additionally, defendant does not argue these delays were in any way tactical on the part of the prosecution. See Automated Med. Labs., 770 F.2d at 403 (citing Marion, 404 U.S. at 324).

Defendant has failed to meet the "heavy burden" of proving that he has suffered "actual substantial prejudice." Jones v. Angelone, 94 F.3d 900, 905 (4th Cir.1996); see id. ("This is a heavy burden because it requires not only that a defendant show actual prejudice, as opposed to mere speculative prejudice, but also that he show that any actual prejudice was substantial-that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected") (citations omitted); United States v. Uribe-Rios, 558 F.3d 347, 358 (4th Cir. 2009) ("Appellant's Fifth Amendment due process argument is unavailing because he has failed to establish that pre-indictment delay resulted in the unavailability of any records, witnesses, or other evidence . . . . [the harm alleged] does not implicate

Appellant's Fifth Amendment right to a fair <u>trial</u>"); <u>United States v. Lopez</u>, 860 F.3d 201, 213 (4th Cir.) (2017) (affirming district court conclusion that defendant "could not meet that burden by identifying specific witness testimony or evidence that was lost to him as a result of the passage of time").[4]

Accordingly, defendant's motion to dismiss as to pre-indictment delay is denied.

        b.       Post-Arrest Delay

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. In determining whether a Sixth Amendment speedy trial violation has occurred, a court must balance the following four factors: "(1) the length of delay; (2) the reasons therefor; (3) the timeliness and vigor of the assertion of the speedy trial guarantee; and (4) prejudice to the defendant." <u>United States v. Hall</u>, 551 F.3d 257, 271 (4th Cir. 2009) (citing <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)). To prevail, petitioner must show under <u>Barker</u> that "on balance, [the] four separate factors weigh in his favor." <u>Id.</u> (citation omitted).

Defendant argues that his Sixth Amendment right to a speedy trial has been violated in that defendant has been in custody for two years, this delay "was occasioned by processes designed to delay prosecution for the purpose of forcing defendant to enter a plea of guilty," and this delay has caused prejudice to defendant including "great physical and psychological harm," "dismantling of his medical practice and loss of his medical license," financial loss, loss of time with family, and has subjected defendant to public criticism, causing anxiety for him, friends, and family. (DE 116 at 2).

---

[4] Because defendant fails to meet the threshold requirement as to actual prejudice, it is unnecessary for the court to address the second relevant factor, the government's reason for the delay. <u>See</u> <u>Automated Med. Labs.</u>, 770 F. 2d. at 403-04.

With regard to the first <u>Barker</u> factor, a reviewing court must decide whether the length of the delay triggers a speedy trial inquiry, with the Supreme Court identifying a delay approaching one year as the time when a court should conduct a full inquiry. <u>Doggett v. United States</u>, 505 U.S. 647, 651-52 & n. 1 (1992). Second, a reviewing court must weigh "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." <u>Id.</u> at 652.

Here, the government concedes that defendant was charged initially by criminal complaint on November 15, 2016, with trial scheduled for October 1, 2018, triggering the <u>Barker</u> enquiry as to the remaining factors. (DE 126 at 53-54). In these circumstances, what will be a two-year period of delay justifies a further speedy trial analysis; however, the court finds this factor does not weigh in defendant's favor in that the delay is not inordinate where at the time of anticipated trial, it will be less than two years since the defendant was charged. <u>See</u> <u>United States v. Hopkins</u>, 310 F.3d 145, 150 (4th Cir. 2002) ("the two year delay before trial was not uncommonly long, especially in comparison with <u>Barker</u> where no speedy trial violation was found even though more than five years had elapsed since arrest").

The second <u>Barker</u> factor, the reasons for the trial delay, weighs in favor of the government's argument for denial of defendant's motion to dismiss. The reasons for a trial delay should be characterized as either valid, improper, or neutral. <u>See</u> <u>United States v. Grimmond</u>, 137 F.3d 823, 828 (4th Cir.1998). On this factor, a reviewing court must carefully examine several issues, specifically focusing on the intent of the prosecution. <u>See</u> <u>Barker</u>, 407 U.S. at 531. Here, the following valid reasons for delay exist: two unopposed motions to determine defendant's competency, requiring months of delay to complete the evaluation and report-writing process, (<u>see</u> DE 22, DE 34, DE 75, DE 85), the withdrawal of the defendant's original defense team and the

appearance of current counsel, (see DE 36, DE 41, DE 43, DE 47), and multiple consent motions to continue deadlines, including those filed by the defendant's attorneys, (see DE 48, DE 57, DE 80). Additionally, there is no evidence, and defendant offers none, that any part of the delay in the case is attributable to improper intent on the part of the prosecution.[5]

The third Barker factor is whether the defendant made a timely assertion of his speedy trial rights. A "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." Barker, 407 U.S. at 531-32. Unlike in Hall, where defendants "asserted their speedy trial rights at their initial appearance," 51 F.3d at 272, defendant has not invoked his speedy trial rights at any point in the last 18 months and has waited to assert this right until five months from the anticipated trial date. See Barker, 407 U.S. at 532 ("failing to assert the right will make it difficult for a defendant to prove he was denied a speedy trial"); Grimmond, 137 F.3d at 829 (concluding that the defendant, who was deemed represented by counsel at all relevant times, failed to invoke his speedy trial rights by waiting until four months before his trial and rejecting his speedy trial challenge). Thus this factor weighs in favor of the government's argument.

Regarding the fourth factor, the Supreme Court has identified three defense interests for consideration: (1) whether there was an oppressive pretrial incarceration; (2) the anxiety and concern suffered by the accused; and (3) the possibility that the defense was impaired. See Barker, 407 U.S. at 532. Of the three defense interests identified in Barker, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.

---

[5] Defendant argues without elaboration that delay after arrest "was occasioned by processes designed to delay prosecution for the purposes of forcing defendant to enter a plea of guilty." (DE 116 at 2). It is not clear what defendant is referring to with regard to these alleged processes.

Defendant offers conclusory and generalized allegations with regard to the first two factors and is unable "to point to any evidence that [his] defense was impaired by the delay." Hall, 551 F.3d at 273; see Hopkins, 310 F.3d at 150 ("Hopkins has not shown, or even argued, that any evidence was damaged or lost, that any witnesses could not be found, or that his case was harmed in any manner by the delay"). In sum, in applying the four Barker factors, no single factor weighs in favor of defendant, and on balance the four separate factors do not weigh in defendant's favor. See Hall, 551 F.3d at 271 (citing Barker, 407 U.S. at 530).

Accordingly, defendant's motion to dismiss as to post-arrest delay is denied.

        c.      Controlled Substances Act

Counts 3-23 and 25-30 of the second superseding indictment state that defendant, "while acting and intending to act outside the usual course of professional practice and not for a legitimate medical purpose, knowingly and intentionally prescribed, dispensed, and distributed a[] controlled substance," in violation of 21 § U.S.C. 841(a)(1). (DE 86 at 3-5).

Without support from relevant case law, defendant appears to argue that the government lacks the authority to charge licensed physicians with violating the CSA, even when those physicians who prescribe controlled substances outside the bounds of professional practice, and thus the court should dismiss counts 1 through 42, each of which are drug related. (See DE 118 at 5-16; see id. at 16 ("All counts related to Dr. Kumar's conduct in the treatment of pain of his patients alleging prescribing, distributing and dispensing must be dismissed for failure to state a crime, failure of subject matter jurisdiction of this Court, or otherwise for insufficiency of evidence")).[6]

---

[6] Defendant's main challenge in this section is to the charges against defendant based on violations of 21 U.S.C. § 841(a)(1) for unlawful dispensation and distribution of controlled substances, and defendant groups all other charges against him, except related to tax evasion, counts forty-three through forty-five, as rising and falling with his arguments concerning 21 U.S.C. § 841(a)(1). (See DE 118 at 4-5).

The Supreme Court and the Fourth Circuit have repeatedly rejected defendant's arguments. In United States v. Moore, 423 U.S. 122, 124 (1975), the Supreme Court held that registered physicians can be prosecuted for violations of 21 § U.S.C. 841(a)(1) for unlawful dispensation and distribution of controlled substances "when their activities fall outside the usual course of professional practice." As stated by the Fourth Circuit, "a licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution [under 21 § U.S.C. 841(a)] and is no different than 'a large-scale pusher.'" United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) (citing Moore, 423 U.S. at 143); id. at 1139 ("This evidence clearly established that the defendant was prescribing controlled substances outside his professional medical practice."); see also United States v. Alerre, 430 F.3d 681 (4th Cir. 2005) (affirming convictions under 21 § U.S.C. 841(a) of licensed medical doctors for distribution of controlled substances outside bounds of legitimate medical practice); United States v. McIver, 470 F.3d 550 (4th Cir. 2006) (affirming conviction under 21 § U.S.C. 841(a) of licensed pain management doctor for distribution of controlled substances outside bounds of legitimate medical practice).[7]

Defendant argues more specifically that the CSA "does not proscribe 'prescrib[ing],'" (DE 118 at 11-13), "licensed physicians [with valid DEA numbers] do not 'distribute' as that term is generally understood or defined by the CSA," (id. at 13-14), and "licensed physicians are not authorized to 'dispense' controlled substances," (id. at 14-16). Case law cited above holds

---

[7] With regards to defendant's argument that the government has provided inadequate evidence of mens rea, (see DE 118 at 5-11), defendant does not allege that the indictment improperly omits an allegation regarding intent, but that the government does not have sufficient evidence of defendant's mens rea. This is a purely factual question to be decided by the jury. See United States v. Engle, 676 F.3d 405, 415 (4th Cir. 2012) ("a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial").

otherwise.  Additionally, as defined by the CSA, to dispense is "to deliver a controlled substance

to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing

and administering of a controlled substance," 21 U.S.C. § 802(10), and a practitioner is "a physician

. . . or other person licensed, registered, or otherwise permitted, by the United States or the

jurisdiction in which he practices . . . to distribute, [or] dispense . . . a controlled substance in the

course of professional practice," 21 U.S.C. § 802(21).

Accordingly, defendant's motion to dismiss "all counts related to Dr. Kumar's conduct in

the treatment of pain of his patients alleging prescribing, distributing and dispensing" is denied.

(See DE 118 at 16).

d.      Outrageous Government Conduct

Where the government's conduct in the course of a criminal investigation is "so outrageous

as to shock the conscience of the court," a defendant may establish a violation of his due process

rights.  United States v. Osborne, 935 F.2d 32, 36 (4th Cir. 1991).  The threshold for establishing

a due process violation is high and a defendant will not sustain his burden merely by demonstrating

"somewhat offensive" or "extremely unsavory" conduct on the part of the government.  Id.; see also

United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013) (describing a defendant's ability to rely

on outrageous government conduct to vacate conviction as theoretical and "highly circumscribed");

id. ("this Court has never held in a specific case that the government has violated the defendant's

due process rights through outrageous conduct").

Here, defendant takes issue with the "surreptitious surveillance and repeated and sustained

harassment by local law enforcement for three years prior to his charging in this Court . . . ."  (DE

118 at 17).  Although not wholly clear, defendant objects to numerous alleged acts taken by the

government during this time period, including "taping of private matters, agents posing as fake patients, solicitation of his patients, invasion of his professional practice and personal activities," and the "seizure of all of his personal [and professional] property and papers," motivated by a "'good ol' boy' personal animus" as well as determination by local officials to target defendant following "the well publicized tragic death of a small child at the hands of a Mother who . . . was ultimately discovered to be a drug seeking addict who killed her own daughter in a vehicle accident while impaired." (Id. at 17-21; see also id. at 18-19 (alleging the government followed defendant around the clock; recorded, followed, and "investigated" patients to "encourage" their cooperation; enticed vulnerable patients to commit offenses; and plan to use "nefarious actors ('addicts' [as opposed to patients])" who "agree[d] to testify to false facts . . . to escape their earned punishment for drug seeking")).

First, it appears that defendant claims that the investigation against him was based on the improper motivation of either retaliation or perhaps due to defendant's race or nationality. However, defendant offers no evidence to support his claims. The government has "broad discretion" in determining who to prosecute. Wayte v. United States, 470 U.S. 598, 607 (1985) (citations omitted). The discretion is, of course, "subject to constitutional constraint." Id. at 608 (citations omitted). The decision to prosecute may not be based on "unjustifiable" factors such as race, religion, or another arbitrary classification. United States v. Armstrong, 517 U.S. 456, 464-65 (1996). "However, absent a substantial showing to the contrary, prosecutions will be presumed to be motivated only by proper considerations." United States v. Hastings, 126 F.3d 310, 313 (4th Cir.

16

1997) (citations omitted).  No such showing has been made here.[8]

Second, defendant provides no support for the numerous allegations concerning the way in which the government has handled defendant's patients and potential witnesses, including the allegation that the government developed "'witnesses' by coercion." (DE 118 at 17-18); see United States v. Erwin, 520 F. App'x 179, 180 (4th Cir. 2013) ("There is no indication that law enforcement manufactured evidence or directed a third party to manufacture evidence.  There is also no indication that law enforcement engaged in unlawful conduct in order to complete the investigation.").

Similarly, defendant offers no support for his assertion that the government has acted improperly regarding defendant's property and seized from his home and office more than was justified by the search warrants issued.  The government has produced in discovery the inventories from the federal search warrants in this case and photographs of items that were seized, which the government asserts defendant has reviewed, and the government maintains "[t]here is simply no truth to the allegation that the Government seized all of the Defendant's papers and property from his home and his office." (DE 126 at 70).  Defendant offers no evidence or argument to the contrary beyond vague assertions that the government seized "all" of his personal and business property and papers.  (See DE 118 at 18).[9]

---

[8] Defendant's allegation that "agents pos[ed] as fake patients" simply alleges that the government engaged in an undercover operation, a contention not in dispute and unrelated to outrageous conduct.  See United States v. Hasan, 846 F. Supp. 2d 541, 546 (E.D. Va. 2012), aff'd, 718 F.3d 338 (4th Cir. 2013) ("Simply put . . . no aspect of the undercover ATF operation at issue here was either 'outrageous' or 'offensive to traditional notions of fundamental fairness' so as to warrant the extraordinary remedy of dismissal of the indictment.").

[9] Defendant also makes unsupported factual accusations unrelated to the government's charges or evidence that, for example, a sergeant with the New Bern Police Department instructed defendant's landlord to sell defendant's property, that the government "maliciously fir[ed] his collector item guns," and "dispos[ed] of his prized vehicle (after playing with it in the parking lot)." (DE 118 at 17-20).  In response the government contends that defendant is mistaken in his belief that anyone told his landlord to sell his property and that the government did shoot defendant's firearms as "standard procedure when firearms are seized as evidence." (DE 126 at 70-71).  These allegations do not support a finding of "outrageous government conduct."

Finally, defendant argues the government has engaged in pervasive surveillance of defendant but offers no evidence to support his position, only asserting that he "has well-documented video . . . and other evidence" and "should such evidence support his accusations," the court "will have no choice but to suppress all fruits of same . . . ." (Id. at 17). The court will consider all evidence presented at trial. However, with regard to the current motion and claim, defendant's accusations regarding the government's surveillance does not "shock the conscious of the court." Osborne, 935 F.2d at 36.

Accordingly, defendant's motion to dismiss for outrageous government conduct is denied.

e.      Request for Hearing

Defendant requests a hearing "at which the parties will be allowed to call witnesses and make a record of sworn testimony and admissible evidence," as to his allegations as found in his second motion to dismiss. (DE 118 at 5, 11, 16, and 30). The court denies this request.

Defendant's claims based on violations of the CSA are legal in nature and do not require witness testimony or presentation of evidence. Additionally, defendant has failed to support his claim regarding outrageous government conduct by the necessary substantial threshold showing.

In sum, the court denies defendant's motions to dismiss at this juncture.

2.      Government's Motion for Interlocutory Sale

On June 20, 2016, Magistrate Judge Gates issued a seizure warrant authorizing the seizure of four vehicles that the government contends were purchased with the proceeds of the defendant's unlawful activity. The vehicles included a 2014 Raptor, 2012 Ford F250, 2016 Jeep Wrangler, and 2013 Chevrolet Silverado. Subsequently, on November 14, 2016, Magistrate Judge Gates issued a second seizure warrant authorizing the seizure of a fifth vehicle, a 2014 Dodge Ram. All five

seized vehicles are currently restrained by virtue of a consensual restraining order, the latest iteration

of which was entered on March 29, 2018.  (DE 96).

The Federal Rules of Criminal Procedure provide that "[a]t any time before entry of a final

forfeiture order, the court, in accordance with Supplemental Rule G(7) of the Federal Rules of Civil

Procedure, may order the interlocutory sale of property alleged to be forfeitable." Fed.R.Crim.P.

32.2(b)(7) (emphasis added).  Rule G(7) of the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture Actions under the Federal Rules of Civil Procedure states in pertinent

part:

> On motion by a party or a person having custody of the property, the court may order
> all or part of the property sold if . . . (A) the property is perishable or at risk of
> deterioration, decay, or injury by being detained in custody pending the action; (B)
> the expense of keeping the property is excessive or is disproportionate to its fair
> market value; (C) the property is subject to a mortgage or to taxes on which the
> owner is in default; or (D) the court finds other good cause.

Here, the government asserts the total value of the vehicles as of April 25, 2018, as

determined by the Internal Revenue Service, using Kelly Blue Book valuations, is $166,000.00. (DE

130-1).   The already-accrued costs as of June 1, 2018 equal $33,347.39 for appropriately

maintaining and storing the vehicles in an indoor facility, presumably since the vehicles were seized.

(DE 130-2--DE 130-5).  In its motion, the government seeks judicial authorization to sell the

vehicles at issue for as little as two-thirds of appraised value. (DE 130 at 4).  Assuming the vehicles

are indeed worth $166,000.00, the government seeks to forgo as much as $56,440.00 in order to

affect an interlocutory sale and avoid storage fees that based on the numbers submitted by the

government appear to be roughly $1,150.00 per month, a loss which could conceivably cover storage

fees for another four years.[10]

Although the government argues that the sale and conversion of the vehicles to cash is in the best interest of both parties, in that "trial is still months away" and "costs will continue to accrue as the value of the vehicles falls," (DE 130 at 3), the government has stored these vehicles for a significant amount of time, roughly two years for four of the vehicles, and offers no numbers on estimated depreciation over time nor an estimate of the time necessary to complete the criminal prosecution in this case. It does not appear based on the information submitted by the government that the value of the vehicles is currently disproportional to storage charges, and the court has insufficient information to determine future value versus future charges. As such, the court declines to exercise its discretion to authorize an interlocutory sale at this time.[11]

Therefore, the government's motion for interlocutory sale is denied.

## CONCLUSION

Based on the foregoing, defendant's motions to dismiss (DE 116, DE 118) are DENIED. The government's motion for interlocutory sale (DE 130) is DENIED.

SO ORDERED, this the 18th day of June, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge

---

[10] The court notes that "defendant has offered to have the property stored at his home, which is also subject of the seizure order and which would alleviate the costs the Government complains are being incurred." (DE 131 at 3, 5).

[11] Defendant argues that based on Supreme Court and Fourth Circuit precedent the government has exceeded its authority in requesting interlocutory sale. (See DE 131 at 4 ("Therefore, something more than mere allegation of 'derived from specified criminal activity' must be demonstrated prior to a taking . . . ."). Defendant is incorrect. Because defendant is subject to an order of forfeiture pending the outcome of this case, the court may properly order an interlocutory sale of the vehicles at issue pursuant to Rule 32.2(b)(7) and Supplemental Rule G(7). Defendant's citation to United States v. Chamberlain, 868 F.3d 290, 291 (4th Cir. 2017) is wholly inapposite where there, "the government conceded that the property at issue is not traceable to any alleged crime and is thus subject to pretrial restraint, if at all, as substitute property pursuant to 21 U.S.C. § 853(p)." No issue regarding substitute property is presently before this court.