IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CR-5-FL-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| SANJAY KUMAR, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for judgment of acquittal as to structuring transaction counts 33, 34, 35, 39, and 40 ("money laundering counts") pursuant to Federal Rule of Criminal Procedure Rule 29. (DE 388). The issues raised have been briefed fully, and in this posture are ripe for ruling. For reasons set forth below, defendant's motion is denied.

## BACKGROUND

On August 12, 2019, a jury found defendant guilty of five counts of unlawful distribution of oxycodone in violation of 18 U.S.C. § 841(a)(1) (counts 3, 4, 5, 9, and 11), five counts of money laundering by concealment in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (ii) (counts 33, 34, 35, 39, and 40), and three counts of tax evasion in violation of 26 U.S.C. § 7201 (counts 43, 44, and 45).

More specifically and as relevant to resolution of the instant motion, counts 3 and 5 charged the defendant with unlawfully prescribing oxycodone to Chris Fulcher on March 14, 2013 and April 12, 2013, respectively, in violation of 21 U.S.C. § 841(a)(1). Counts 4, 9, and 11 charged the defendant with unlawfully prescribing oxycodone to Ashley Fulcher on April 9, 2013, January 10, 2014, and February 12, 2014, respectively, in violation of 21 U.S.C. § 841(a)(1). Counts 33, 34, 35, 39, and 40 charged the defendant with money laundering, in violation of 18 U.S.C. §

1956(a)(1)(B)(i) and (ii), and alleged that October 25, 2013 and June 3, 2014, defendant conducted financial transactions, cash deposits, involving the proceeds of specified unlawful activity, funds derived from the unlawful distribution of controlled substances, with the intention of concealing those proceeds and/or avoiding transaction reporting requirements. The specific deposits at issue regarding these money laundering counts are as follows:

| Count | Bank | Account | Account Owner | Time of Deposit | Date of Deposit | Amount |
|---|---|---|---|---|---|---|
| 33 | BB&T | 0178 | NBMSR | 13:20 | 10/25/13 | $4,120 |
| 34 | BOA | 1997 | Kumar | 13:53 | 10/25/13 | $1,000 |
| 35 | BB&T | 4717 | Kumar | 13:22 | 10/25/13 | $5,000 |
| | | | | | | $10,120 |

| Count | Bank | Account | Account Owner | Time of Deposit | Date of Deposit | Amount |
|---|---|---|---|---|---|---|
| 39 | BB&T | 0178 | NBMSR | 14:37 | 6/03/14 | $3,000 |
| 40 | BB&T | 1840 | Kumar | 14:34 | 6/03/14 | $7,980 |
| | | | | | | $10,980 |

On August 12, 2019, defendant filed the instant motion. Defendant argues that because the jury found defendant guilty of only five counts of unlawful distribution on five separate days, proceeds of which would total $1,000.00,[1] such is insufficient to sustain a verdict on the money laundering counts, where the jury found deposits in the amount of $21,000.00 identifiable as "proceeds of unlawful activity." (DE 388 at 2-3). Defendant argues, therefore, "the verdict is inconsistent, and the structuring counts must be dismissed for insufficiency of the evidence" and "inconsistency of the verdict." (Id.). Defendant puts forth no case law or further argument in support of his motion.[2]

---

[1] Evidence was presented at trial that defendant charged $200.00 per patient visit.

[2] Pursuant to this court's Local Criminal Rules of Practice and Procedure Rule 47.1(b) and 47.2(a), all motions with exceptions not applicable here "shall be filed with an accompanying supporting memorandum" that will include "statement of the facts that pertain to the matter before the court for ruling" and "argument . . . relating to the matter before the court for ruling with appropriate citations." Counsel is directed to conform to the applicable local rules in all filings.

**COURT'S DISCUSSION**

A. Standard of Review

A defendant may "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed.R.Crim.P. 29(c)(1). A Rule 29 motion for judgment of acquittal must be denied if when "'viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt.'" United States v. Harvey, 532 F.3d 326, 333 (4th Cir.2008) (quoting United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982)).

B. Analysis

Sufficient evidence was presented at trial to find defendant guilty on the money laundering counts.[3] In order to sustain a conviction under 18 U.S.C. § 1956(a)1)(B)(i) and (ii), the government must prove: 1) defendant conducted or attempted to conduct a financial transaction having at least a de minimis effect on interstate commerce; 2) defendant knew that the money or property involved in the financial transaction was the proceeds of some form of unlawful activity; 3) the money or

---

[3] The court rejects defendant's cursory argument as to the inconsistency of the verdict and focuses solely on the sufficiency of the evidence as to the money laundering counts. As held by the United States of Appeals for the Fourth Circuit:

> That Hassan was acquitted of the Count Two conspiracy is not accorded any weight in our analysis. Even if that verdict is inconsistent with the guilty verdict on Count One, a jury is permitted to return an inconsistent verdict if it sees fit to do so. See United States v. Powell, 469 U.S. 57, 63, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The question before us relates solely to the Count One conspiracy and whether—viewed in the light most favorable to the prosecution—that charge was properly proven against Hassan.

United States v. Hassan, 742 F.3d 104, 144 n.36 (4th Cir. 2014); see also United States v. Louthian, 756 F.3d 295, 305 (4th Cir. 2014) ("[A]n inconsistent verdict can result from mistake, compromise, or lenity, and a jury could just as likely err in acquitting as convicting); United States v. Green, 599 F.3d 360, 369 (4th Cir. 2010) ("[I]t has long been settled that inconsistent jury verdicts do not call in question the validity or legitimacy of the resulting guilty verdicts."); United States v. Blankenship, 707 F.2d 807, 810 (4th Cir. 1983) (citations omitted) ("An inconsistent verdict in a multi-count indictment is not grounds for reversal . . . the court should not inquire into the reasoning process or motivation behind the verdict."); United States v. Cherry, 330 F.3d 658, 667-68 (4th Cir. 2003) (finding that acquittal on substantive embezzlement counts did not undermine defendant's money laundering conviction).

property was, in fact, the proceeds of specified unlawful activity; and 4) defendant knew that the financial transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds, and/or to avoid a transaction reporting requirement under state or federal law. United States v. Wilkinson, 137 F.3d 214, 220 (4th Cir. 1998). The court will address the sufficiency of the evidence as to each element in turn below.

1. De Minimis Effect on Interstate Commerce

To be a "financial transaction" as required by the statute, the transaction must satisfy one of the four requirements set forth in 18 U.S.C. § 1956(c)(4). Under that provision, a financial transaction includes a transaction that affects interstate or foreign commerce and involves the use of a "monetary instrument," which is defined in 18 U.S.C. § 1956(c)(5) as currency, money orders, checks, travelers checks, investment securities, or negotiable instruments in bearer forms. Interstate nexus may be proven by evidence that the funds were deposited in a bank insured by the Federal Deposit Insurance Corporation ("FDIC"). See United States v. Peay, 972 F.2d 71, 74 (4th Cir. 1992).

The evidence is undisputed that defendant knowingly made the cash deposits that form the basis for his money laundering convictions on October 25, 2013 and June 3, 2014. As to interstate nexus, the government called bank representatives from BB&T and Bank of America who testified that the FDIC insured customer funds on deposit at their respective financial institutions at all relevant times.

2. Defendant Knew Transactions Involved Proceeds of Some Form of Unlawful Activity

To establish a violation of 18 U.S.C. § 1956(a)(1), the government must prove defendant knew the money involved in the financial transactions represents the proceeds of some form of unlawful activity that constitutes a felony under state, federal, or foreign law. 18 U.S.C. §

4

1956(c)(1). In this case, the money laundering counts accuse defendant of laundering his own funds, and the court can turn to the evidence showing defendant engaged in the specified unlawful activity, unlawful distribution of a controlled substance, to show defendant's knowledge that the money involved in the financial transactions represents the proceeds of that specified unlawful activity. See United States v. Godwin, 272 F.3d 659, 669 (4th Cir. 2001) (proving knowledge element by establishing that defendant was "intimately involved" in the underlying specified unlawful activity, a scheme to defraud); see also United States v. Elder, 682 F.3d 1065, 1071–72 (8th Cir. 2012) ("Having found Solomon guilty of the controlled substance offenses, a reasonable jury could find . . . that Solomon intended to conceal the nature and source of the proceeds of unlawful activity . . . .").

The evidence presented at trial, taken in light most favorable to the government, establishes as follows. For more than ten years, defendant operated a purported pain management clinic in New Bern, North Carolina, called "New Bern Medicine and Sports Rehabilitation." Defendant's practice became widely known in the pill-seeking community in the New Bern area as a place to obtain an opioid prescription in exchange for $200.00 per visit to defendant's office. Defendant was the sole owner of his business. He alone collected and controlled the proceeds that it generated.

Defendant's business was cash only, operated from late afternoon into the evening, and had no staff after mid 2012. There was little if any medical equipment in use, and defendant did not take vital signs like weight, blood pressure, or temperature. Exams were brief, 10 to 15 minutes initially and less as time went on. Exams almost always culminated with defendant writing an oxycodone prescription at the first visit and every subsequent visit. The majority of patients received a starting prescription of 10 mg oxycodone 120 pills. Thereafter, patients were either maintained at the same dosage or their dosage was increased. Defendant did not pursue alternative treatment options prior

to writing chronic opioid prescriptions or refer patients to specialists. Defendant did not routinely collect medical records from prior providers. If records were obtained, more likely than not, they were provided directly to defendant by the patient, instead of the patients' providers, leaving them at risk of alteration. Defendant continued to prescribe to patients after they repeatedly obtained narcotics from other doctors.

Defendant did not conduct urine drug screens at the first visit, prior to writing opioid prescriptions. After the first visit, when evidence showed urine drug screens were conducted, these screens were not legitimately conducted. Urine samples were provided in unmarked plastic drinking cups. Multiple patients testified that they left their samples on the bathroom floor alongside other unmarked urine-filled cups. Separate trash pulls by the Drug Enforcement Agency ("DEA") recovered bags filled with empty cups smelling of urine but no drug test kits.

The government's expert witness, Dr. Lawrence Greenblatt, testified that based on an extensive review of defendant's medical records for the period from 2011 to 2016 and other investigative material, it was his expert opinion that defendant prescribed opioids outside the bounds of professional medical practice. He opined that as opposed to providing actual medical care, defendant engaged in business transactions with his patients involving the payment of $200.00 in exchange for an opioid prescription.

Additionally, evidence was presented at trial that defendant's patients performed countersurveillance tasks for him. Evidence was presented as recorded by defendant in his own records that one patient provided intelligence to him about other patients. Additionally, defendant provided free visits to a patient in exchange for work accomplished including sweeping defendant's office for bugs and enlisting a friend to obstruct the DEA pole camera located in the parking lot of defendant's practice in the middle of the night. An additional patient, in exchange for free visits,

checked the roof of the business for wires, wore video-recording glasses into pharmacies to surreptitiously record employee's responses to being presented prescriptions written by defendant, installed screening material along the fence line that divided defendant's business from a trailer park, wrote down license plate numbers in the parking lot, and separately obstructed the DEA pole camera.

Here, there was substantial evidence from which the jury could reasonably have concluded that defendant was engaged in unlawful drug distribution, in the form of controlled substance prescriptions written outside the bounds of professional medical practice and not for a legitimate medical purpose, throughout the 2013 and 2014 periods that preceded the financial transactions at issue.

3. Money was Proceeds of Specified Unlawful Activity

A violation of 18 U.S.C. § 1956(a)(1) requires the government to prove that the property involved in the financial transaction was, in fact, the proceeds of an offense constituting a specified unlawful activity. The statutory definition of "specified unlawful activity" includes "felonious . . . buying, selling, or otherwise dealing in a controlled substance." 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(D). The government need not trace the funds involved in the transaction to a specific transaction, such as a particular drug sale, nor is the government required to show all the money involved in the financial transaction was derived from an unlawful activity. As held by the Fourth Circuit:

> To satisfy [the government's] burden where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no "untainted" funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity . . . . As a consequence, it may be presumed in such circumstances, as the language of section 1957 permits, that the transacted funds, at least up to the

7

full amount originally derived from crime, were the proceeds of the criminal activity
or derived from that activity.

United States v. Moore, 27 F.3d 969, 976–77 (4th Cir. 1994) (citing United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990) (section 1956 does not require tracing of transacted property to a particular drug sale)); see also United States v. Murphy, No. 91-5416, 1992 WL 130202 at *9 n.22 (4th Cir. April 27, 1993) (citations omitted) ("The Government does not have to trace the funds involved in a financial transaction to particular drug proceeds . . . . Congress did not intend that participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both specified unlawful activities and other activities.")).[4]

The money laundering counts do not define the specified unlawful activity by reference to any particular drug counts, but instead define the specified unlawful activity generally as the "dispensation and distribution of a controlled substance." (DE 86 at 7). This is an appropriate method of alleging the specified unlawful activity. See United States v. Smith, 44 F.3d 1259, 1265 (4th Cir. 1995) ("Just because the statute requires that funds be obtained from 'specified' unlawful activity does not mean that the government is required to detail the circumstances of the unlawful activity.").

Here, viewing the evidence in the light most favorable to the government, a jury could infer that the five cash deposits, on October 25, 2013 and June 3, 2014, "involved" drug proceeds for purposes of 18 U.S.C. § 1956(a)(1). Phillips testified about his analysis of defendant's financial

---

[4] Defendant urges in his motion for acquittal that the specified unlawful activity proceeds in the money laundering counts must derive from the controlled substance prescriptions specifically charged in the indictment and for which the jury returned guilty verdicts. (DE 388 at 2). However, defendant provides no argument nor case law, nor is the court aware of any, in support of the position that such is required. See Moore, 27 F.3d at 976–77; see also Blackman, 904 F.2d at 1257. Similarly, there is no requirement, as defendant seems to suggest, that the Government establish that every dollar of those deposits is tainted. See Moore, 27 F.2d at 976.

activity during the years in question, including the transactions at issue in the money laundering counts. He explained that he referenced defendant's CSRS prescribing data to determine the number of visits at which defendant prescribed Schedule II controlled substances to patients and then calculated the proceeds from each visit based on his standard per visit fee of $200.00. In examining defendant's financial activity, Phillips also concluded that defendant's sole source of cash available to deposit into his account was derived from his business.[5]

Phillips's testimony, coupled with substantial evidence from the government's patient witnesses and medical expert regarding defendant's unlawful prescription-writing habits during at least 2013 and 2014, provided the jury with sufficient basis to reasonably infer that the funds at issue in the money laundering counts were, in fact, specified unlawful activity proceeds. See, e.g., United States v. Pendergrass, Nos. 93–5422, 1995 WL 56673, at *7 n.6 (4th Cir. February 7, 1995) (citing Blackman, 904 F.2d at 1257) ("Evidence of a defendant's lack of legitimate income, when combined with evidence of a defendant's drug trafficking and use of wire services to transfer money, is sufficient to sustain a conviction for money laundering.").

  4.  Designed to Conceal and/or Avoid

The evidence at trial established that defendant knew that the financial transactions at issue in the money laundering counts were designed to conceal specified unlawful activity proceeds and/or to avoid transaction reporting requirements. Defendant deposited no cash in 2012, but beginning in March 2013, shortly after he stopped keeping books and records and as his opioid prescriptions

---

[5] Regarding prescriptions written, evidence was put forth that in the last seven months of 2010, prior to the offense period, data from the North Carolina Controlled Substance Reporting System ("CSRS") showed that defendant wrote less than 20 prescriptions for Schedule II controlled substances. By 2013, defendant wrote almost 3,000 prescriptions. Similarly, defendant wrote nearly 3,000 prescriptions in 2014 and over 2,000 prescriptions in 2015. Based on this evidence and considering defendant's standard fee of $200.00 per office visit, Internal Revenue Service ("IRS") agent Eric Phillips ("Phillips") estimated defendant earned nearly $600,000.00 in 2013, nearly $600,000.00 in 2014, and over $400,000.00 in 2015.

9

were climbing, and continuing through 2016, defendant made cash deposits totaling over $400,000.00. Every deposit, including those that are the subject of the money laundering counts, was below the threshold that would trigger the bank's responsibility to file a currency transaction report with the Financial Crimes Enforcement Network at the United States Department of the Treasury, that amount being cash deposits less than $10,000.00. Evidence was present that defendant broke up the cash deposits across multiple bank accounts on the same day and went to separate banks on the same day to divide up his cash deposits.

That defendant never deposited more than $10,000.00 in cash into a single bank account would support the jury's inference that defendant intended to conceal specified unlawful activity proceeds and/or avoid reporting requirements in connection with money laundering counts. See United States v. Villarini, 238 F.3d 530, 533 (4th Cir. 2001) (breaking cash into small increments supports intent to conceal and structure under §1956(a)(1)(B)).[6]

In sum, sufficient evidence was presented at trial to find defendant guilty on the money laundering counts.

## CONCLUSION

Based on the foregoing, the court DENIES defendant's motion for judgment of acquittal. (DE 388).

SO ORDERED, this the 26th day of September, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge

---

[6] Evidence also was presented that defendant's structured banking transactions were part of a larger pattern of concealing income and avoiding government reporting, including falsifying his tax returns multiple years to disguise his true income, structuring payments for vehicles to avoid triggering government reporting, and stuffing hundreds of thousands of dollars into hermetically-sealed PVC pipes in preparation for burial.