IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CR-5-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| SANJAY KUMAR, | ) | |
| | ) | |
| Defendant. | ) | |

This matter came before the court for sentencing at hearing commencing September 4, 2020, and concluding September 8, 2020. The court memorializes herein reasons for adopting the findings and conclusions in the presentence report regarding base offense level, enhancements, and advisory guidelines range of imprisonment. The court reiterates its grant of defendant's motion for downward variance, albeit not to the full extent requested, and denial of the government's alternative motion for upward variance, for reasons stated herein and additionally at hearing.

A.      Presentence Report

In his first four objections, defendant argues that the court should disregard the presentence report, not adopt factual findings based upon acquitted conduct, and disregard all factual findings in the presentence report attributed to investigators and not found by the jury. With respect to the presentence report, the court already determined that a presentence report is required in this case

in its scheduling orders. Thus, disregarding the presentence report under Fed. R. Crim. P. 32(c) is not warranted.[1]

Regarding acquitted conduct and findings not based upon a jury determination, it is well-established that the court may consider acquitted conduct in determining the relevant conduct and offense level. See United States v. Grubbs, 585 F.3d 793, 803 (4th Cir. 2009). "[A]n acquittal is not a finding of any fact," and "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." United States v. Watts, 519 U.S. 148, 155 (1997). In addition, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person" in determining a sentence. 18 U.S.C. § 3661. Thus, where the factual findings in the presentence report are supported by a preponderance of the evidence that is credible and reliable, the court may rely upon them in determining the advisory guidelines range. See, e.g., United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006); see also United States v. Wilkinson, 590 F.3d 259, 269 (4th Cir. 2010).

B.    Drug Weight and Base Offense Level

Defendant objects to the determination of base offense level 34 premised upon a calculation of 22,792.66 kilograms of converted drug weight.

In determining drug weight for purposes of the advisory guidelines range, the court must include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). "[I]n a drug distribution case,

---

[1]    The court also overruled defendant's pro se objection to proceeding with sentencing hearing on the basis that defendant did not have an opportunity prior to sentencing to review the final presentence report. Where the draft presentence report was filed in December 2019, and where court confirmed that changes reflected in the final report were limited to the probation officer's response to defendant's copious objections to the draft report, which defendant had months to review and comment upon through voluminous filings, the requirement of review and discussion with counsel had been satisfied in accordance with Federal Rule of Criminal Procedure 32(i)(1)(A). In any event, defendant had additional opportunity to review the final presentence report during the three and one-half day period between the initial day of hearing and concluding day of hearing.

2

quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3, comment. (n.9).

Section 841 of Title 21 makes it unlawful, in pertinent part, to "distribute, or dispense . . . a controlled substance," except as authorized. 21 U.S.C. § 841(a)(1). In turn, "a physician . . . is authorized only to act 'as a physician,'" when prescribing controlled substances, in "the usual course of professional practice." United States v. Moore, 423 U.S. 122, 141 (1975). Thus, a physician violates § 841(a)(1) when writing prescriptions that are "not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice." United States v. Singh, 54 F.3d 1182, 1187 (4th Cir. 1995). "There are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice." Id. (quotations omitted). "Rather, the courts must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." Id. (quotations omitted).

Courts have considered a range of factors when determining whether prescriptions are made outside the usual course of professional practice. For example, in Moore, the United States Supreme Court observed that the defendant "gave inadequate physical examinations or none at all," and "ignored the results of the tests he did make." 423 U.S. at 142-43.

In United States v. Hurwitz, the United States Court of Appeals for the Fourth Circuit observed the defendant "commonly performed only the most cursory examinations-if he performed them at all-prior to prescribing heavy doses of controlled substances." 459 F.3d 463, 474 (4th Cir. 2006). He "had a reputation in the drug community for his practice of prescribing high amounts of narcotics, and one cooperating source claimed to have become a patient for that

3

very reason." Id.  Patients "paid in cash, suggesting that [the defendant] made a common practice of fronting drugs rather than practicing medicine." Id.

In United States v. Alerre, the Fourth Circuit recognized that a district court may rely "in part on expert testimony that [a defendant] had deviated drastically from accepted medical standards." 430 F.3d 681, 691 (4th Cir. 2005).  The court observed that "evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares." Id.  The court noted that the defendant directed "physicians to conduct superficial physical examinations of [] patients that served no medical purpose and were intended only to make the issuance of prescriptions look like the practice of medicine." Id. at 684–85.  The defendant "developed a medical record template with boilerplate diagnoses that could be loaded into patients' charts and used to deceive insurance companies and investigators." Id. at 685.  "Patients were given various diagnostic tests to justify insurance billings, and . . . physicians systematically requested outside radiologists to 'over read' magnetic resonance imaging pictures in order to justify specific prescriptions." Id.  Furthermore, although "fifteen to twenty percent of . . . patients had legitimate medical problems, . . . all patients were treated the same—i.e., they all received the narcotic medication—without regard to medical necessity." Id.  "[M]any of the prescriptions lacked appropriate documentation or had no 'follow up' treatment," and "defendants ignored 'red flags' indicative of drug abuse." Id. at 686.

In United States v. McIver, the defendant "ignored evidence of the danger of prescribing drugs to certain patients, the drug-seeking behavior of others, and the drug abuse of still others." 470 F.3d 550, 564 (4th Cir. 2006).  In Singh, it was significant that the defendant "never referred [a patient] to a specialist." 54 F.3d 1182, 1188 (4th Cir. 1995); see also United States v. Boccone,

556 F. App'x 215, 232 (4th Cir. 2014) (noting "no outside documentation at the initial visit," "lack of evidence of compliance with referrals; and drug tests negative for prescribed medications").

In this case, the government introduced credible testimony at trial and sentencing by Lawrence Greenblatt, MD ("Greenblatt"),[2] who described multiple factors indicative in this case of prescriptions outside the bounds of professional medical practice. Factors identified by Greenblatt include the following: 1) opioids were prescribed, typically in a set monthly dosage of 120 pills, at the first visit and every visit, without accounting for differences in patient history of opioid use; 2) records of prior treatment were not obtained from providers, or they were not appropriately reviewed, prior to prescribing opioids; 3) alternative treatments were not explored prior to prescribing opioids, e.g., physical therapy, chiropractic, steroid injections, other strategies for managing pain; 4) warning signs of addiction and abuse, such as getting prescriptions from another practice, violations of pain protocol, breaks in time where patients had acknowledged receipt of addiction treatment, were disregarded in favor of continuing opioid prescriptions; 5) there were no referrals to other specialists; 6) while diagnostic tests were sometimes ordered, tests did not result in any change in management; 7) while urine drug tests were reported as being done, there were no results in medical records, and the results were a sham given the method of testing and supposed 99 percent favorability rate; 8) random pill counts were not ordered, documented, or complied with to ward against diversion; 9) patients paid by cash only, almost always at a flat rate of $200 per visit; 10) examinations, if made at all, were perfunctory and standardized and not necessarily relevant to patients' complaints; 11) a stark comparison between defendant's prior practices, involving clear instructions for exercise therapy and recourse to other non-opioid approaches, and current practices with opioid only treatment; 12) exercise room used was a sham

---

[2] At this time, a complete trial transcript has not yet been prepared. The court draws upon its internal notes and recollection of the testimony at trial and sentencing.

without any guidance or monitoring: handing out prescriptions to patients in a group in the exercise room; 13) asking patients to perform personal services like filming interactions with pharmacies or writing letters on his behalf for free visits; 14) making prescription decisions of one patient based upon information provided by other patients; 15) related patients coming in with complaints of chronic pain; 16) lack of any staff and books and records of receipts.

Considering these factors and a review of patient records for the patients identified at paragraph 44 of the presentence report, Greenblatt opined that these opioid prescriptions were not made within the usual course of professional medical practice, but were instead outside the bounds of medical practice. In light of the case law identifying similar factors and the totality of the circumstances in this case, the court finds the testimony of Greenblatt credible, reliable, and compelling.

Furthermore, the government introduced medical records and evidence for each of 49 patients that it contends support a drug weight equivalency of at least 10,000 kilograms, establishing the base offense level of 34. (Gov. Mem. (DE 552) at 43-55). Based on the court's review of the medical records introduced by the government at sentencing, in conjunction with the trial and sentencing testimony of Greenblatt, considering the totality of the circumstances of defendant's practice, the court finds by a preponderance of the evidence that the base offense level determination in the PSR is correct.

In evaluating the credibility and reliability of Greenblatt's opinion, the court has considered, for example, testimony and records regarding prescriptions given by defendant to Adrienne Hall ("Hall"), including prescriptions corresponding to charges where the jury returned a verdict of acquittal, also in the light of defendant's statement at hearing that evidence of this

individual's treatment supports a determination in his favor. That testimony and evidence further confirms the credibility and reliability of Greenblatt's opinion.

For example, Greenblatt specifically testified at trial that based upon his review of Hall's records between October 2013 and May 2014 that prescriptions written by defendant for Hall were not provided inside of a legitimate medical practice. Hall came in with a complaint of right shoulder pain, and the physical examination suggested that she had a deformity of her shoulder, which was not supported by her radiographic findings. Other modalities and other treatment strategies weren't used which could have been used in her case, and she was given an opioid prescription on her first visit and every visit. In an intake form, she referenced prior acute care, and she did not indicate physical therapy or having seen an orthopedic specialist, which evidence lack of adequate evaluation or safe therapy for her problem.

In addition, she indicated an allergy to Tylenol, which is a red flag as individuals might present as having such an allergy because opioids without Tylenol are more readily crushed and snorted. This sign of falsification and abuse is amplified by the fact that CSRS shows she had been taking Tylenol throughout the past year with opioids. In addition, there was no documentation confirming consultation with Hall about the dangers of opioids. There was no documentation that defendant obtained records from prior physicians, no documentation of pill count or inquiry of family members. There was no referral. Physical examinations are documented at every visit, though it changes little or none, which is possible but extremely unlikely, and evidence of padding of the record with boilerplate language.

This assessment by Greenblatt is corroborated by Hall's testimony at trial and medical records. Hall described prior treatment by defendant in 2003-2004, using a more holistic approach, avoidance of narcotics. She described a stark change in 2013, including method of referrals, his

7

reputation then for lax prescription writing, without needing medical records or other back up items. She was set up with an appointment by her then-boyfriend, who also saw defendant, and who had used street drugs. She understood that getting a prescription from defendant was not difficult, but getting it filled would be difficult. Defendant came to the office maybe three days per week, and could have appointments between 4:00 p.m. and midnight, even though forms about the office contained boilerplate, obsolete, references to regular hours and contact information. When Hall showed up to her first appointment, no staff were present, roughly 15 people were waiting, some in hallway, some in other people's laps. There was no receipt given for her cash payment of $200. Defendant would give prescriptions to a group of five or ten individuals waiting in the gym area, let them out the side door, and videotape their departure. Hall experienced short exams, which became shorter with subsequent visits. Defendant would check on a computer to see if Hall had received narcotics prescriptions from another provider. She never gave a urine sample, or gave a pill count.

Defendant's office records for Hall include an initial referral for magnetic resonance imaging (DE 554-7 at 35); limited description of symptoms on an intake form (id. at 34); an initial report of Tylenol allergy complaints of shoulder pain (id. at 33, 23); examination findings repeated in subsequent visits (id. at 3, 28-32); police report of arrest for possession of drug paraphernalia (id. at 27); printout of CSRS reports, one noting contract violation for ER visit (id. at 8, 26); a signed patient protocol form (id. at 25); boilerplate form including reference to regular office hours daily from 11:00 a.m. to 5:00 p.m. and Friday from 11:00 a.m. to 3:00 p.m. (id. at 24); and radiology reports (id. at 9-21).

In sum, as this example shows, the evidence fairly permits an inference of prescriptions given to Hall outside the bounds of professional medical practice. In reliance upon the same

8

categories of evidence, the court finds drug weight attributed to remaining patients listed in paragraph 44 by a preponderance of the evidence, particularly the 49 patients identified and detailed in the government's sentencing memorandum and sentencing exhibits. While a contrary viewpoint is possible and urged by defendant, and while some patients present more compelling evidence than others, the court finds in each instance drug weight by a preponderance of the evidence, particularly when considering the opinion and testimony of Greenblatt, testimony of the patients, the medical records of the patients, together in light of all the facts and circumstances in the record.

Defendant raises a number of arguments, both in his sentencing memorandum and pro se filings, which do not undermine a finding of the drug weight by a preponderance of the evidence. Many of the issues raised, however, were considered by the court as mitigating factors in addressing the § 3553 factors and the court's variance sentence.

For example, defendant argues that the North Carolina Medical Board ("NCMB") never informed him after inquiry that he was improperly prescribing opioids, and that he should not be held to a federal prescribing standard. (See, e.g., DE 564-1 (November 13, 2013, NCMB letter to defendant). The standard under Fourth Circuit law is clear, however, in that it requires an objective, "case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." Singh, 54 F.3d at 1187. For purposes of drug weight and base offense level calculation, the government has presented ample evidence of prescriptions outside of the bounds of medical practice, regardless of any review by the NCMB. In addition, per testimony by Greenblatt, review by the NCMB is a limited snapshot that is not able to into account many of the most compelling red flags applicable in this case, including the day to day operations of the practice, patterns of individuals served, and the stark contrast between defendant's prior practices

9

and practices during the offense period.   Review by the NCMB also is not able to detect patterns of padding of medical records, falsification, or use of boilerplate language.

Defendant argues that "[l]ow dose opioid medications in mono-therapy regime are effective for the treatment of chronic pain," (Sent. Mem. (DE 562) at 26), and he points in pro se objections to comparison with prescribing practices of other physicians.  But, a focus only on the dose per patient prescribed does not outweigh the other factors relied upon the government to show treatment outside the bounds of medical practice.  Furthermore, per testimony of Greenblatt, whether monotherapy or not, the initiation and repetition of monthly opioid prescriptions for patients in conjunction with all other factors in this case creates an inference of prescribing outside the bounds of medical practice.

The court recognizes defendant's efforts through voluminous pro se submissions (see, e.g., separate index of pro se filings, attached hereto in addendum) to provide counterpoints to many of the factors bearing on whether he wrote prescriptions outside the bounds of medical practice. The court has reviewed all of defendant's pro se submissions, including videos of patients visiting pharmacies, excel spreadsheets, and power point presentations, along with embedded images and records.   The court also has listened to audio recordings of witness interviews filed with defendant's sentencing memorandum.  Including in reliance on these materials, defendant raises several arguments bearing on the court's consideration of factors for differentiating lawful and unlawful prescriptions, which individually and in the aggregate are insufficient to overcome the court's drug weight determination for purposes of the base offense level and advisory guidelines range.

For example, defendant asserts that, for every 30 to 40 patients he talked to on the phone, he pre-selected only two or three of them to come into the office for an appointment.  As such, he

10

asserts, there were 2000 people he considered with no appointments made. Notwithstanding the fact that much documentation appearing to evidence the declination of specific individuals was constructed by defendant after the instant charges were brought, this argument is a red herring. What is relevant to the court's analysis is not the number of calls he fielded, but what he did with the patients who received prescriptions. Defendant argues that greed could not be his motive because he told 2000 people not to come into the office to get a prescription. But this argument is contrary to the evidence that defendant worked only part-time, and only limited hours late in each day, and he did not need to work any more hours in order to obtain a substantial amount of cash income, much of which funded purchases of expensive motor vehicles, jewelry, electronics, firearms, and other luxury items. The evidence also supports his careful selection of patients fitting a certain profile to minimize risk of discovery of his illicit enterprise by law enforcement.

Defendant argues that people who came into the office already underwent therapy, accident interventions, and other approaches which did not help. This argument is, again, contrary to the evidence, as demonstrated, for example, by the testimony of Hall. Defendant appears to challenge the fact that every visit resulted in narcotics prescription, but again he diverts to irrelevant facts about patients who did not come in for an appointment. The evidence regarding opioids prescribed at each visit is overwhelming.

Defendant argues he tried to get medical records on his patients. Ultimately, this is a credibility determination, and the testimony and objective evidence in the record are sufficient for the court to find that defendant did not properly obtain prior medical records, much less records directly from physicians, for patients on whom the court relies for its drug weight calculations. Likewise, defendant argues he undertook urine tests, and that is how he discharged patients, but defendant does not offer any explanation of how those tests were completed, particularly in light

of testimony regarding urine being left in ordinary cups on the floor in the bathroom on limited occasions. Thus, on this point, defendant's testimony/allocution regarding urine testing is manifestly false.

Defendant also challenges the conclusion that he falsified medical records by copying and pasting. While the court recognizes that not all statements in the medical records were copied and pasted, this argument misses the overall point that there is substantial evidence supporting a determination of superficial and irrelevant examinations and examinations documented but not performed.

Regarding two patients who died of drug overdose (Edwin Desmond and Franklin Lane) and involvement of another patient (Amber Garris) in a car crash resulting in death of a child (see, e.g., Presentence Report ¶¶ 32, 66-72, 73-77), the court does not find that defendant caused these deaths or the fatal accident. Nevertheless, defendant's involvement in these patients, and their course of treatment, is one factor among many in evaluating the evidence.

Defendant challenges being labeled a "pill mill." However, the court need not establish this label in order to support the drug weight. The factors the court relies upon are sufficient to establish by a preponderance of the evidence the drug weight. Defendant reiterates he saw few patients per month. In light of evidence of defendant's limited part time hours, evening work, the total number of patients is not determinative of the court's drug weight determination, particularly where other factors such as no staff, cash only, and no bookkeeping are present.

In sum, while defendant raises areas of factual dispute, the government has, upon consideration of the totality of the circumstances, met its burden of establishing the base offense level by a preponderance of the evidence. Defendant's voluminous commentary and backtracking on the evidence rings hollow and is not credible – for purposes of the drug weight and offense

12

level calculation – when considering that defendant for many years himself recognized and proclaimed the level of care that is required for chronic pain patients. For these many reasons, the court overrules defendant's objection to the base offense level.

C.    Enhancements to Base Offense Level

1.    Possession of Firearm Enhancement, § 2D1.1

"The enhancement for weapon possession . . . reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1(b)(1) comment. (n. 11(A)). This "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id.

Here, there is ample evidence to support the enhancement. Multiple witnesses observed defendant with a firearm, including during patient examinations. (See Presentence Report ¶ 23). Brooke Finger ("Finger") testified that during her first visit on January 30, 2013, defendant thought he heard a noise in the ceiling and proceeded to climb a ladder, push open a ceiling tile, and unholster his handgun, all during her exam. (Id. ¶ 60). Defendant contends he used a flashlight and not a weapon in this incident. Even if true, because a firearm was present on defendant's person during the course of exams where defendant unlawfully prescribed oxycodone for cash, it is not clearly improbable that the weapon was connected to the offense conduct. Therefore, the enhancement properly applies.

Defendant's arguments in opposition to this enhancement are inapposite. Defendant argues, for example, that he was lawfully carrying a firearm and had his own reasons for carrying a firearm. He spoke of target practice with another medical professional with whom he originally was associated prior to opening his own medical practice. He stated that his religious practices make him especially unwilling to use a weapon against any person. He also points out his acquittal

13

on the firearms offenses that were charged for possession in furtherance of a drug trafficking crime. These points, however, do not undermine application of the enhancement.

Defendant also challenges the credibility of the testimony of Finger, as noted, asserting that he did not draw his firearm in the instance described. In light of all the circumstances described in the record, the court does not find credible defendant's account that the weapon he wore on his hip during his patient examinations, while working alone in a cash-based practice operated as this one was, had no connection. In any event, application of the enhancement is justified by the presence of the firearm alone, at the office, given the transactional nature of the practice, and the unlawful prescriptions to individuals seeking pills.

2.    Maintaining a Premises, § 2D1.1(b)(12)

In applying the enhancement for maintaining a premises for the purpose of distributing a controlled substance, under § 2D1.1(b)(12), "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1(b)(12) comment. (n.17). "In making this determination, the court should consider how frequently the premises was used by the defendant for . . . distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." Id. "Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." Id.

Here, the enhancement is supported by a preponderance of the evidence. There is no dispute defendant had both possessory interest in the premises and controlled all activities at the

premises. In addition, defendant unlawfully prescribed oxycodone from the premises. While defendant argues he did not engage in any transfer of pills on the premises of his office, the statute of conviction and the offense conduct is triggered not only by physical transfer of opioids, but also distributing and dispensing opioids, construed to include writing prescriptions outside the bounds of professional medical practice. See Moore, 423 U.S. at 141. Therefore, defendant's argument in opposition to this enhancement is unavailing.

3.    Abuse of Position of Trust, § 3B1.3

"If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." §3B1.3. Here, this enhancement applies because defendant used a position of private trust "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" to further his unlawful prescriptions. Id. comment. (n. 1).

Defendant argues that the court cannot have it both ways: If defendant is only trafficking in drugs, then there is no doctor/patient relationship. Defendant's approach, however, unduly narrows both the language of the enhancement and the evidence in this case. The enhancement is broad enough to cover actions of a physician taken "under the guise of an examination," id., and this is the type of conduct that is at issue in this case triggering application of the enhancement. There is substantial evidence in the record that defendant engaged in examinations of patients as a guise or ruse to appear to justify prescriptions written outside the bounds of professional medical practice. Moreover, even though individuals who appeared at defendant's practice may have been complicit and did not consider themselves patients, defendant still held himself out as a physician.

15

Therefore defendant's objection to this enhancement is overruled, also for reasons discussed more particularly at hearing.

        4.        Organizer, Leader, Manager, or Supervisor, § 3B1.1(c)

Section 3B1.1(c) specifies a 2-level increase shall be assigned if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than those described in (a) or (b) of U.S.S.G. §3B1.1. "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 comment. (n. 2). The term "participant" is defined as "a person who is criminally responsible for the commission of the offense, even though they were not charged with it." U.S.S.G § 3B1.1, comment. (n. 1). "Leadership over only one other participant is sufficient as long as there is some control exercised." United States v. Rashwan, 328 F.3d 160, 166 (4th Cir. 2003).

Here, defendant directed the activities of Gary Williams in searching the office for bugs and enlisting a friend to climb an electrical pole to obstruct the lens of a Drug Enforcement Administration camera. (See Presentence Report ¶ 22). Randy Bryan checked the roof of the office for surveillance wires in exchange for free visits, wore video-recording glasses into pharmacies to record, installed screening materials, wrote down license plate numbers, kept "an eye on" other patients, and assisted with obstructing the DEA pole camera. (Id. ¶¶ 30, 56, 57). Defendant also relied upon Crystal Scott, who was described as the queen of pill dealing in New Bern, "as a source of intelligence about patients." (Id. ¶¶ 20, 21). Therefore, defendant controlled the activities of these individuals as they participated in the furtherance of and concealment of his drug distribution offenses.

In so holding, the court recognizes defendant's viewpoint, as expressed repeatedly at sentencing and in pro se materials, that he enlisted the help of others in an attempt to uncover

improper law enforcement techniques and pharmacist techniques. But, in light of the court's determination of offense conduct and base offense level, the court does not accept the premise of defendant's arguments that only law enforcement and pharmacists were acting in the wrong, to the exclusion of defendant. Rather, having determined that defendant engaged systematically in unlawful distribution of opioids, it follows that the defendant was the leader or manager of the participation of others in furthering and concealing such offenses.

     5.       Obstruction of Justice, § 3C1.1

"If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1. The application notes for the instant section specifically provide that the obstruction enhancement applies to "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation." Id. § 3C1.1 n.4(D).

Here, evidence supporting the preceding enhancement also supports the instant enhancement, based upon defendant's conduct in preventing the pole camera from collecting footage, and in taking actions to make it more difficult for law enforcement to follow his patients. (22, 30, 56-67; see also Tr. (DE 544) at 2-4). In addition, defendant committed perjury by giving false testimony at trial concerning a material matter, for example, by stating that he carried out accurate drug screening through urine tests where the testimony and evidence regarding such tests is to the contrary. He also testified that he only issued prescriptions for a legitimate medical purpose, where at a minimum it is beyond any doubt that prescriptions given to Chris and Ashley

17

Fulcher were not for a legitimate purpose. Accordingly, defendant's objection to this enhancement is overruled.

In sum, the court adopts the determination in the presentence report that the total offense level is 43, and criminal history category I, producing an advisory guidelines range of life, which due to statutorily authorized maximum sentences is expressed in a term of imprisonment of 2,580 months.

D.    Section 3553(a) Factors and Variance Sentence

Having calculated the advisory guidelines range, it is incumbent upon the court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of 18 U.S.C. § 3553(a). Kimbrough v. United States, 552 U.S. 85, 111 (2007) (quoting § 3553(a)); United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2010). The court "must determine whether a sentence within that [guidelines] range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence that does serve those factors." United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006). In this manner, "the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." Kimbrough, 552 U.S. at 113 (Scalia, J. Concurring).

In determining the particular sentence to be imposed under this standard, the cout shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
> . . . .

18

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a). In addition, the court must consider "the sentences legally available; [] the Sentencing Guidelines; [] Sentencing Commission policy statements; . . .and the need for restitution." United States v. Fowler, 948 F.3d 663, 668 (4th Cir. 2020).

Here, the court determined at sentencing that the advisory guidelines range does not serve the factors set forth in § 3553(a), and that a substantial downward variance sentence is warranted by the unique circumstances of the instant case, for all the reasons the court expressed orally at sentencing. In so holding, the court granted defendant's motion for a downward variance, finding that a sentence substantially below the guidelines range, a reduction of over 90 percent to a term of 240 months, is sufficient, but not greater than necessary, to serve the § 3553(a) factors. Nevertheless, the court disagreed with defendant that a variance to the full extent requested, down to a sentence of time served, or approximately 51 months, would be reasonable under the circumstances.

At the same time, the court denied the government's alternative motion for an upward departure or variance on the basis that defendant caused the deaths of Edmond Desmond, Franklin Lane, and the child of Amber Garris. The evidence is insufficient, as noted earlier, to support a determination of causation as the government urges. Nevertheless, also as noted above, the court takes into account defendant's involvement with these patients, and the profound risks of opioid addiction, as factors in evaluating the gravity of defendant's offense conduct and the need to protect the public from further crimes of defendant.

## CONCLUSION

In sum, for the reasons stated herein and orally at sentencing, the court adopted the findings and conclusions in the presentence report, regarding base offense level, enhancements, and

advisory guidelines range for term of imprisonment.  As noted, however, while the court takes into account the advice of the guidelines, the court finds that advice inadequate in fashioning a sentence that is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).  The court adheres to its analysis of § 3553(a) factors as articulated orally at sentencing, in imposing a variance sentence of 240 months imprisonment in this case.

The clerk is DIRECTED to ensure that the USB drive, as referenced in the addendum hereto, and the compact disc, as delivered to the court with defendant's sentencing memorandum, are also made part of the record in this case.

Issues remain before this court.  To reiterate, by separate order, the court has directed further briefing on three oral motions made at sentencing, which the court has referred to a magistrate judge for decision when ripe: 1) pro se oral motion for an accounting of funds held in trust account of attorney Deborrah L. Newton, and for transfer of funds in trust account to attorney Brian Taylor; 2) pro se oral motion for an accounting from the government of funds held in bank accounts; and 3) oral renewed motion for return of property, in supplement to DE 389 motion for release of property. (See Order (DE 588) (Sept. 11, 2020)). Defendant's omnibus brief in support of these oral motions is due on or before September 21, 2020, and the government's response is due within 14 days of filing thereof.  In the same order, the court directed defendant to file on or before September 21, 2020, a response to the government's motion for confiscation, forfeiture, and disposal of firearms (DE 568), which motion also remains pending.

SO ODERED, this the 15th day of September, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge

# ADDENDUM

Case 4:17-cr-00005-FL   Document 590   Filed 09/15/20   Page 21 of 24

## Index of Pro Se Objections

This index is drawn from a USB drive, which the court makes a part of the record in this case, containing a second set of pro se objections (also filed August 25, 2020, at docket entry numbers 524-528, 531-532), as well as several categories of files that were not capable of being filed electronically in the court's Case Management / Electronic Case Filing ("CM/ECF") system. As such, the present index is structured based upon the file names on the USB drive. Folder and file names are reproduced below verbatim without alteration, and text is reproduced in all caps where in all caps in original. The court's descriptive text is placed in brackets.

1. PSI MY FINAL OBJECTIONS ATTACHMENT 2 LISTS [file folder]
   a. PSI REPORT OBJECTIONS EXHIBITS [file folder]
      i. HIGHDOSEOTHERDOCS
         [file folder containing single Word document of the same name]

      ii. NOAPPOINTMENTS
         [file folder containing single Word document of the same name]

      iii. PHARMACISTS DISCRIMINATE
         [file folder containing single Word document of the same name]

      iv. RECOMMENDATIONS
         [file folder containing single Word document of similar name]

      v. [Individual Word documents and Excel spreadsheets not in folders comprising defendant's commentary on medical records, CSRS files, and documents regarding pharmacies and prescriptions of other physicians]

2. PSI MY FINAL OBJECTIONS ATTACHMENT 3 NEXUS FOLDER [file folder]
      [This file folder contains four power point files illustrating connections between law enforcement, Rodney Knowles, neighbors, and others who followed and surveilled defendant and other individuals who defendant describes as "a common

core group of people, who are all cops and their friends and who are all acquainted with one another."]

3. PSI MY FINAL OBJECTIONS ATTACHMENT 4 – MY INPUT ON COUNSEL'S OBJECTIONS TO THE DRAFT PSR

[This file folder contains a single Word document that is 32 pages of all-caps narrative and bullet points, with a cover page that is a picture of a satellite in space]

4. PSI MY FINAL OBJECTIONS ATTACHMENT 5 ELOCUTION & SENTENCING HEARING MEMO

[This file folder contains a single Word document that is 578 pages of all-caps narrative and bullet points, interspersed with images of documents and letters, including commentary on the evidence and the government investigation; it includes 310 pages of pro se written allocution]

5. PSI OBJECTIONS VIDEO CLIPS

[This file folder contains six videos dated September and October 2014, including of people in pharmacies, vehicles, and parking lots. In one, for example, a pharmacist is filmed stating "We don't fill prescriptions for Dr. Kumar" and then stating that if the patient goes to a different doctor, he can get his prescription filled. (20141018_025738.AVI)].

6. PSI 1 REPORT MY FINAL OBJECTIONS AND ANALYSIS

[This is a single Word document comprising Part 1 of 5 of pro se objections, pertaining to paragraphs 10-30 of the presentence report, totaling 1082 pages of narrative and exhibits including medical records and letters and other document excerpts].

7. PSI 2 REPORT MY FINAL OBJECTIONS AND ANALYSIS

[This is a single Word document comprising Part 2 of 5 of pro se objections, pertaining to paragraphs 31-32 of the presentence report, totaling 366 pages of narrative and exhibits including medical records and letters and other document excerpts].

8. PSI 3 REPORT MY FINAL OBJECTIONS AND ANALYSIS

[This is a single Word document comprising Part 3 of 5 of pro se objections, pertaining to paragraphs 33-77 of the presentence report, totaling 588 pages of narrative and exhibits including medical records and letters and other document excerpts].

Case 4:17-cr-00005-FL   Document 590   Filed 09/15/20   Page 23 of 24

9. PSI 4 A OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
   [This is a single Word document comprising Part 4a of 5 of pro se objections, pertaining to paragraph 78 of the presentence report, totaling 75 pages of narrative and exhibits including document excerpts, and photographs of items seized].

10. PSI 4 B OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 4b of 5 of pro se objections, pertaining to including financial records, photographs, and other document excerpts, totaling 76 pages].

11. PSI 4 C OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 4c of 5 of pro se objections, pertaining to paragraph 79 of the presentence report, totaling 126 pages of narrative and exhibits including letters and other document excerpts, and photographs of a search of an office].

12. PSI 4 D OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 4d of 5 of pro se objections, pertaining to "office stuff missing", personal items seized, surveillance of home, totaling 71 pages of narrative and exhibits including photographs letters and other document excerpts].

13. PSI 4 E OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 4e of 5 of pro se objections, pertaining to neighbors, surveillance activities, police work, totaling 117 pages of narrative and exhibits including photographs and other document excerpts].

14. PSI 4 F OF F REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 4f of 5 of pro se objections, pertaining to PSR paragraphs 80-92, totaling 170 pages of narrative and exhibits including financial records and letters and other document excerpts].

15. PSI 5 REPORT MY FINAL OBJECTIONS AND ANALYSIS
    [This is a single Word document comprising Part 5 of 5 of pro se objections, pertaining to PSR paragraphs 93-200, totaling 591 pages of narrative, and arguments, elocution, and exhibits including medical records and letters and other document excerpts].